(No. 18080.—

STEPHEN D. SEAMAN, Appellee, *vs.* GUSSIE HASS *et al.* Appellants.

*Opinion filed October 25, 1928.*

HAROLD L. FEIGENHOLTZ, (G. H. KRIETE, of counsel,) for appellants.

LEWIS F. JACOBSON, ROY C. MERRICK, and CAMERON LATTER, for appellee.

Mr. COMMISSIONER CROW reported this opinion:

This cause is before the court by appeal from a decree of the superior court of Cook county for specific performance of a contract for the sale and conveyance of real es-

tate by defendants, appellants here, to appellee, complainant below.

Appellee in his bill averred that Gussie Hass was possessed of and purported to be the owner of premises known as No. 2216 Milwaukee avenue, Chicago, the legal description of which was stated, and that on January 26, 1923, she and Max J. Hass, her husband, entered into a contract with appellee whereby they agreed to convey to him the property at the price of $8000, appellee to assume an incumbrance of $3500, pay $300 deposit, $3200 upon delivery of the deed, and give a note for the remaining $1000; that he was ready, willing and able to perform the contract on his part and had tendered performance in accordance with its terms, but that appellants refused to execute a conveyance, and had, some time after the execution of the contract, begun to deny that there was a contract and to claim that the property was of much greater value than the contract price, and that appellee, upon demanding the production of the contract, was informed that it had been lost or destroyed. A copy of the contract was attached to the bill and is in the standard Chicago Real Estate Board form, with the addition of two special clauses hereafter referred to. Appellants answered, averring that the contract they signed was different in terms from that sued on, in that the contract they executed contained a clause stating that it was not to become effective or delivered unless ratified on the following day by all the parties thereto; that the contract was never ratified or fully executed or delivered by appellants and so was never in force; that the contract sued on was not a true copy of the contract drawn and signed; that William Chones, an attorney and the agent of appellants, was to hold the signed contract until notified by appellants that they were ready and willing to perform and to have the contract delivered. Replications being filed, the cause was referred to a master, with directions to take and report proofs and findings and recommend a decree.

The master filed his report, finding the issues in favor of appellee and recommending a decree for specific performance of the contract as prayed. Objections to this report, renewed as exceptions before the court, were overruled, and a decree was entered in conformity with the prayer of the bill and the master's report.

The premises consist of a lot improved with a two-story frame building, containing a store occupied by a tenant and a flat occupied by appellants as a residence, and stood in the name of Gussie Hass. The property was owned either by Max J. Hass, who testified he was the owner, or by both, she testifying that she was one of the owners. The property was listed by them for sale at $8000 with Walter J. Spengler, a real estate broker. On January 25, 1923, Regan, an employee of Spengler, called at the Hass home with Seaman and told Mrs. Hass he had a buyer at $7500. She expressed herself as pleased but reminded him that the property was listed at $8000. That call was in the afternoon. She told Regan he would have to come back in the evening, when her husband was at home. They returned in the evening. Hass said he did not want to sign any papers without his attorney, and, after the price of $8000 had been agreed upon, an appointment was made for all parties to meet at the office of William Chones, the attorney of Hass, the following morning. The next morning Mr. and Mrs. Hass arrived at Chones' office before Regan and Seaman and had some talk with him before they arrived. They told him the sale price agreed upon was $8000. A conference of two or three hours followed, during which all the details were talked over, at the conclusion of which Chones drew the contract and explained its terms fully to appellants. Some discussion arose about the Hasses staying in the flat until May 1, and a clause was written with pen by Chones giving the right to remain until April 30 at $30 a month rent. Hass objected to the amount of the commission, and another clause was written on the contract with a pen, pro-

viding that the commission should be $225 if the buyer performed the contract but only $100 if he backed out, and the commission had to be taken out of the deposit forfeited. Those two clauses were written on the margin of the printed form of contract. Chones told Hass to bring in the abstract of title the next day and he would have it brought down to date.

Another point discussed at the conference was as to who should hold the deposit. Regan suggested putting it in escrow with the Chicago Title and Trust Company, but Chones said the deal was a small one and they did not want expense, and it was finally agreed that Chones should hold it for both parties, and the deposit of $300 was left with him, for which he gave a receipt. Hass says he heard nothing said about a deposit and saw no money paid, but Mrs. Hass heard the discussion and saw the deposit made. The contract was read by Chones to Hass, who expressed himself as satisfied with it, and it was handed to Hass to read but he declined to read it. He testified he read nothing in it except a clause giving appellants the right to withdraw from the contract up to the following Monday. No such clause appears on the copy of the contract in evidence, which was identified by three witnesses, Chones, Seaman and Regan, as a true copy of the original. They testified there was no talk about such a provision. The contract was then signed by Seaman and by Mr. and Mrs. Hass. A copy was made by Chones and given to Regan, and the parties left Chones' office.

On the way home Mrs. Hass became ill on the car, and she remarked to her husband that if she got sick already from just going down-town, what would she be when they got to looking for another house. When they arrived home they talked about how little could be done in the way of buying another place with only $8000 and "decided to back out." Mrs. Hass told her husband he should see Chones the next morning and tell him they were backing out. Hass

went to see Chones the next day and told him he was sorry but they would have to back out of the deal; that his wife was crying and did not want to sell. Chones told him he could not do that unless Seaman agreed, and he would better see Seaman. Hass returned home and told his wife what had occurred, and she asked him why he had not asked Chones to tear up the contract, to which he replied he had not thought of that. It seems then to have been agreed between them that Mrs. Hass should see Chones and ask him to destroy the contract, which she did on the next Monday. Chones looked for the contract but could not find it. He first made a search for it on Saturday, when Hass was there. The contract was never found. Chones tried to call up Regan but could not reach him, and later Hass called at Spengler's office and told Regan they would not perform the contract but would be willing to pay the commission if the brokers would dump their clients, "or words to that effect." Mrs. Hass says Chones did not tell her there was a copy of the contract. Seaman and Spengler insisted that the contract be performed. After some time spent in an effort to arrive at an amicable adjustment, a tender of the remainder of the purchase money was made and a demand made upon appellants for a deed. Their reply to the demand was, "We don't know anything about any contract; we will have nothing to do with you; you will have to see our lawyer." Thereupon the bill for specific performance was filed, upon which the decree complained of was rendered.

Only a question of fact is presented by the record: Did appellants on January 26, 1923, enter into the contract to sell and convey the real estate described in the bill? On that day they executed a written contract, by which Seaman agreed to purchase at the price of $8000 the two-story frame building and lot of ground upon which it stood, at 2216 Milwaukee avenue, and Gussie and Max Hass agreed to sell that property at the price mentioned,

and to convey to the purchaser a good and merchantable title thereto by a general warranty deed, with release of dower and homestead rights, subject to existing leases, taxes levied after 1922 to date of the deed, and subject to a first mortgage of $3500 at seven per cent interest, and certain other reservations not affecting the question now involved. The contract recited that the purchaser had paid $300 as earnest money, to be applied on the purchase when consummated, and to make further payment within five days after the title had been examined and found good or accepted by the purchaser, the insurance premium, and the remainder of the purchase price as therein specified. The contract was signed by Gussie Hass and Max J. Hass, and by the vendee, Stephen D. Seaman.

The contract was prepared by William Chones at the suggestion of Hass. It was satisfactory to the purchaser, and an appointment having been made, Mr. and Mrs. Hass arrived at Chones' office and had a talk with him before Regan and Seaman arrived. The contract was prepared by Chones after an extended discussion between the parties upon certain points stated above. After it was signed by both parties a copy was made and given to Regan, Chones retaining the original by agreement of the parties to the contract. That the contract was executed is not an open question. Any doubt on that question is dispelled by the testimony of Mrs. Hass, fully set out in the additional abstract filed by appellee, as follows: "I am the wife of Max J. Hass and am a part owner of the property at 2216 Milwaukee avenue. There was some talk in Chones' office about the mortgage being $3500, and, if he agreed to it they had to pay us $4500. Regan asked, 'How about his commission?' and we said, if we agreed to sign it and we sold it then he would get his commission. He said at first he wanted $250. My husband said that was too much. Regan said he would make it $225 if we agreed. Mr. Chones said we should sign the contract. My husband

asked him if he made out everything. He showed it to my husband to look over. There was something about our remaining in the premises after the sale. We were talking that if we decided to sell the property, when they wanted it. They said, if we couldn't go so quick we should pay them $30 a month and stay as long as we wanted. I said, 'All right; if I agree to it to stay then I pay you the $30; if I don't agree, then I ain't got nothing to you and you ain't got nothing to me.' They said, 'All right,' and that was the way they signed the contract, and that was all. * * * After all the different points had been talked over then Seaman and my husband and I signed the contract and left it with Chones. On Monday I went back and asked Chones to destroy the contract."

The testimony of Max Hass corroborates his wife's testimony and that of all the witnesses for appellee. He testified as shown by the additional abstract: "I am the owner of the property 2216 Milwaukee avenue. I read English. Chones told me I should go through the contract, and I told him it was too much for me to read. He showed me on the side it was written out in black ink, 'Only till Monday,' he showed me. I did not see any money pass. I did not see Seaman give any money to Chones. I didn't hear anything said about making a deposit. I don't know whether anything was said about making a deposit or giving any money to bind the contract. Later the same day I went to Regan at his office, 2145 Milwaukee avenue, and told him that I backed out. Mrs. Hass and I got to Chones' office before Regan and Seaman. I discussed the matter with Chones and told him what I wanted put in the contract. My wife told Chones the price, $8000, to go in the contract. I don't know how long we talked to Chones before Regan and Seaman came. Chones asked them about what was to go into the contract, and afterward he got one of those printed blanks and started to prepare the contract after we had talked about what was to go into it. Chones

asked what the price was to be and how much was to be paid down, and I told him; also as to how large a mortgage was to be given back. The amount of the mortgage on the $3500 was also discussed; $3000 cash was to be paid. I heard nothing about a deposit. We did not discuss a deposit. After we had talked for a while Chones prepared a contract partly written and partly typewritten, then added something to it in typewriting and added something to it in handwriting. Seaman and Regan then went out for a while, leaving me and Mrs. Hass with Chones. Chones gave me the contract to read, and I told him it would take me half a year to go through it. He said the particulars were on the sides of the contract; that I would see that we had till Monday to back out. I saw that it said on the contract that each party had until Monday to back out. I read that. I did not read any of the rest of the contract. I don't remember that there was anything said about our staying in the property until the first of May. I don't remember reading or hearing read the clause in the contract to that effect and never heard anything about it. I can't remember that Mrs. Hass said anything about it."

Chones, who prepared the contract, contradicted the testimony of Hass. He testified there was no provision in the sale contract that the vendors had until Monday to "back out." He did not tell Mrs. Hass to sign the contract then so she would not have to come back on Monday, as she testified. He wrote no memorandum on the margin of the contract stating that it was not to be in force until Monday. Chones further testifies that Hass came to his office the next morning after the contract was written and said, "Mr. Chones, my wife is crying and she don't want to sell." I said to him, "That is a nice how-do-you-do; you have signed a contract; I explained it to you; you can't go to work and back out now." He said, "I can't help it; my wife has been crying, and she don't want to go through." I said, "I can do nothing for you; you go to see Mr. Sea-

man, and if he wants to release you from the contract I am satisfied." Hass was down at his office several times afterward and told him the same thing. He further testified that the copy of the contract in evidence was a full, true and complete copy of the contract signed by the parties; that there was no other clause or provision of any kind in the original contract that is not on the copy.

The evidence does not support the contention of appellants that the contract was one for the conditional sale of the property. If, in fact, the contract was one containing a provision, as they contend, that the vendors had until Monday to decline to be bound by it, it is difficult to understand their distress about it. That clause was all they were asking to have included in the contract. The evidence shows beyond a reasonable doubt that it was not in it, and that the vendee was seeking a contract effective *in præsenti*. If that clause was in it, it is unreasonable to believe that Mrs. Hass would have asked her husband why he did not have Chones tear up the contract. It is strange beyond credulity to tolerate, that tearing up or destroying the contract with that provision for their protection in it could have been the subject of serious conversation between appellants. A conversation probably took place, but it was because that clause was not in the contract. There could be no other reason for it. Again, if the right of revocation was reserved in the contract there would be no occasion for offering to pay the commission if the brokers would "dump their clients."

No useful purpose can be subserved by a further discussion of the facts. A careful consideration of the abstract of appellants and of the supplemental abstract of appellee, which was necessary to fully present the facts to this court, leads to but one conclusion. No other decree in consonance with equitable principles and with justice could have been rendered by the superior court. The contract was fairly and understandingly made, was not inequitable in

its terms, and sound judicial discretion requires that specific performance be decreed as a matter of right and not as a favor. *Smith* v. *Dugger,* 310 Ill. 624; *Woodrow* v. *Quaid,* 292 id. 27; *Allen* v. *Hayes,* 309 id. 374.

The decree of the superior court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Crow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*